Ahmad SADIGHI, et al., Plaintiffs,

v.

Ali DAGHIGHFEKR, et al., Defendants.

No. 2:98–2648–18.

United States District Court,
D. South Carolina,
Charleston Division.

Jan. 22, 1999.

Mark Mason, Charleston, SC, for plaintiffs.

John Massalon, Charleston, SC, C. Allen Gibson, Jr., Charleston, SC, for defendants.

## ORDER

NORTON, District Judge.

This action is before the court on Defendants' Motion to Strike and Motion to Dis-

miss for Failure to State a Claim Upon Which Relief May be Granted.[1]

## I. PROCEDURAL HISTORY

On September 11, 1998, Plaintiffs filed their Complaint against twenty-three Defendants for twenty-two causes of action: RICO, breach of contract, breach of contract with fraudulent intent, misappropriation of corporate opportunity, statutory wage act violations, tortious interference with contract, quantum meruit, unjust enrichment, rescission of alleged release, breach of fiduciary duty, fraud, civil conspiracy, Title VII violations, intentional infliction of emotional distress, and unfair trade practices.

On September 18, 1998, the Feker Defendants moved to dismiss and strike items from the Complaint.

## II. BACKGROUND

Because this is a Rule 12(b)(6) motion, the facts are set forth as alleged by Plaintiffs. Ali Daghighfekr (Allan Feker) is a real estate developer who owns a large number of residential golf communities. Plaintiffs essentially allege that Feker fraudulently hires law abiding professionals to work for his fraud-ridden business enterprises, all the while secretly intending to use them as "front men" and "window dressing" to carry out his fraudulent schemes and shield him from criminal culpability. Plaintiffs' allegations of Feker's wrongdoing principally encompass transactions relating to the Golden Ocala residential project in Florida and the Dunes West project in South Carolina. Plaintiffs allege that Feker has (1) attempted to bribe employees at Georgia–Pacific to obtain the Dunes West development at a reduced sales price; (2) bribed and obtained funds under false pretenses from employees of General American Life Insurance Company (GALIC); (3) misrepresented the value of infrastructure improvements to be sold to Golden Ocala Community Development District (GOCDD); (4) sexually harassed Plaintiff NeSmith (including unwanted sexual advances and sexual intercourse leading to a constructive discharge); and (5) wrongfully

or constructively discharged the remaining Plaintiffs.

## III. LAW/ANALYSIS

Defendants moved to dismiss Plaintiffs' claims for violations of RICO, Title VII, and the South Carolina Unfair Trade Practices Act. Defendants also moved to dismiss the claims for breach of contract, tortious interference with contractual relations, and the "alter ego" allegations based on an insufficient pleading of that doctrine. Finally, Defendants moved to strike a number of the allegations in the Complaint. Each claim will be analyzed separately below.

### A. Standard of Review

■ Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants filed this Motion to Dismiss for failure to state a claim upon which relief may be granted. A Rule 12(b)(6) motion should be granted "only in very limited circumstances." *Rogers v. Jefferson–Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir.1989). When ruling on such a motion, the court should "accept as true all well-pleaded allegations and should view the complaint in the light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993); *see also Colleton Regional Hosp. v. MRS Med. Review Sys., Inc.*, 866 F.Supp. 896, 899 (D.S.C.1994). Indeed, a Rule 12(b)(6) motion should not be granted unless the court is certain that the plaintiff could not prove any facts in support of the plaintiff's claim. *See Martin Marietta Corp. v. International Telecommunications Satellite Org.*, 991 F.2d 94, 97 (4th Cir.1992).

### B. Motion to Dismiss RICO Cause of Action

#### 1. Overview of RICO Standing and Causation

Plaintiffs have alleged that Defendants are liable to Plaintiffs for a substantive violation of RICO. Although RICO is a criminal statute, the legislation provides for a civil remedy for private plaintiffs. *See* 18 U.S.C.

---

1. At the motions hearing, the court denied Defendants' Motion to Dismiss Based on violations of

Rule 8 and Rule 9(b).

§ 1964(c) (1994). Section 1964(c) provides that "[a]ny person injured in his business or property *by reason of* a violation of section 1962 . . . may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." *Id.* (emphasis added). The Supreme Court has framed this causation requirement as one of standing. *See Brandenburg v. Seidel,* 859 F.2d 1179, 1187 (4th Cir.1988), *overruled on other grounds by Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996).

■ Plaintiffs must allege that Defendants' violations were a proximate cause of their injuries. *See Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Chisolm v. TranSouth Fin. Corp.,* 95 F.3d 331, 336 (4th Cir.1996). In *Holmes,* the Supreme Court cautioned lower courts against an overly expansive view of the common law doctrine of proximate cause by noting that "a plaintiff who complained of harm flowing from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover." *Holmes,* 503 U.S. at 268–69, 112 S.Ct. 1311. Instead, proximate cause requires a nexus between the proscribed acts and the injuries. *See Mid Atl. Telecom, Inc. v. Long Distance Servs., Inc.,* 18 F.3d 260, 263 (4th Cir.1994). However, this nexus does not mean that only injuries "suffered by the immediate victim of a predicate act" satisfies the "by reason of" requirement of § 1964(c). *Id.* The court should instead focus its inquiry on deciding " 'whether the conduct has been

so significant and important a cause that the defendant should be held responsible.' " *Chisolm,* 95 F.3d at 336 (*quoting Brandenburg v. Seidel,* 859 F.2d 1179, 1189 (4th Cir. 1988)). The court should be guided in this inquiry by such factors as "the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection." *Brandenburg v. Seidel,* 859 F.2d 1179, 1189 (4th Cir.1988), *overruled on other grounds by Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996).

■ Plaintiffs allege that Defendants engaged in conduct in violation of 18 U.S.C. §§ 1962(a), (b), (c), and (d). To have standing to assert private causes of action for these RICO violations, Plaintiffs must allege (1) violations of § 1962; and (2) injuries to their business or property that were proximately caused by these RICO violations.

### 2. 18 U.S.C. § 1962(a)

#### a. Alleging a Violation

■ To state a claim under § 1962(a), Plaintiffs must allege that (1) a defendant person [2] (2) received income derived from (3) a pattern of racketeering activity [3] (4) and invested the racketeering income or its proceeds (5) in the acquisition of an interest in or the establishment or operation of (6) any enterprise [4] (7) engaged in, or the activities of which affect, interstate or foreign commerce. *See* 18 U.S.C. § 1962(a) (1994). In short, section 1962(a) prohibits a person from receiving income from a pattern of racketeering activity and then using that income in the operation of an enterprise engaged in commerce. *See New Beckley Mining Corp. v.*

---

2. Section 1961(3) defines a "person" as including "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3) (1994). This definition covers the use of "person" throughout all RICO sections.

3. Section 1961(1) enumerates a list of state and federal crimes that constitute "racketeering activity" and so serve as "predicate acts" under the RICO statute. *See* 18 U.S.C. § 1961(1) (1994). Section 1961(5) indicates that a " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any

period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5) (1994). These definitions apply whenever the terms are used throughout the RICO statute.

4. Section 1961(4) defines an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (1994). This definition applies whenever the term "enterprise" is used in the RICO statute. In § 1962(a), the defendant may be the enterprise. *See Busby v. Crown Supply, Inc.,* 896 F.2d 833, 841 (4th Cir.1990).

*International Union, UMW of America,* 18 F.3d 1161, 1165 (4th Cir.1994).

▬▬ Were this court relying merely on Plaintiffs' Complaint, the RICO cause of action might have been dismissed for failure to state a claim. However, this court will consider both the Complaint and the Second Amended RICO Case Statement (RCS) filed on November 6, 1998. *See Cardwell v. Sears Roebuck & Co.,* 821 F.Supp. 406, 407 & n. 3 (D.S.C.1993) (similarly considering both the Complaint and the RICO Case Statement in response to a Rule 12(b)(6) motion).[5] Plaintiffs' allegations in their RICO Case Statement sufficiently state a claim under § 1962(a). The following quotation is the verbatim answer to the court's pertinent interrogatory regarding § 1962(a): [6]

Beginning in 1995, Defendant Allan Feker, and Defendant, Golden Ocala Golf Course Partners, fraudulently obtained funds from the Resolution Trust Corporation ["RTC"], acting as Receiver of First State Savings Bank, F.S.B., Mountain Home, Arkansas, by the creation of fake documents misrepresenting that the Feker Defendants had expended monies to remove asbestos and contaminated soil from the Golden Ocala project. These fake documents were prepared for the purpose of obtaining monies belonging to and held in escrow by the RTC. These fake documents were transmitted to the RTC and others by acts of wire and mail fraud. The racketeering funds so obtained were thereafter invested in the acquisition and operation of Golden Ocala Golf Course Partners [and numerous other companies owned by Feker] and the Feker Defendants' parent company, U.S. Golf & Leisure, Inc. From U.S. Golf & Leisure, Inc.[,] these funds were invested into the Feker Defendants' various real estate projects.

Funds obtained by the Feker Defendants through use of fake invoices, receipts and checks submitted by acts of wire and mail fraud to General American Life Insurance Company ("GALIC") for "reimbursement" of expenses relating to the Dunes West real estate project were invested into U.S. Golf & Leisure, Inc. and from U.S. Golf & Leisure into the Golden Ocala real estate project in Ocala, Florida, and Feker's other real estate projects.

Funds obtained and retained by the Feker Defendants as a result of the fraudulent inducement of the employment and business associations of and with Sadighi, Miller, Riggins, and NeSmith were invested in the acquisition and operation of the Feker Defendants' enterprises. Feker obtained these monies by making use of these employees' services and then not paying for them.

(RCS at 86–87). Feker and his companies are the defendant persons who allegedly received funds through the submission of fake invoices and receipts by wire or mail intending to obtain money by fraud. Such actions are predicate acts of wire or mail fraud and thus may constitute racketeering activity. *See* 18 U.S.C. §§ 1341, 1343, 1961(1)(B) (1994).[7] This court also finds that Plaintiffs' allegations are sufficient to state a claim that Feker was involved in a "pattern" of racketeering activity. Section 1961(5) defines a "pattern of racketeering activity" to require "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5) (1994). Although "two such acts are necessary to make out a RICO pattern, they may not be sufficient." *Brandenburg v. Seidel,* 859 F.2d 1179, 1185 (4th Cir.1988), *overruled on other grounds by Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). Two elements must be present to establish a

---

5. Defendants relied upon the *Cardwell* case in their Motion to Dismiss, and this court used the same RICO Case Statement interrogatories as the district court used in the *Cardwell* case.

6. The court asked the following interrogatory: "11. If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following informa-

tion ... b. Describe the use or investment of such income." (RCS at 85).

7. "The offenses of mail and wire fraud require use of the mails or wires coupled with an intent to defraud." *Morley v. Cohen,* 888 F.2d 1006, 1009 (4th Cir.1989).

pattern—relationship and continuity. *See Morley v. Cohen,* 888 F.2d 1006, 1009 (4th Cir.1989). "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 241, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). As to the relationship component, the Supreme Court has stated that " '[c]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Id.* at 240, 109 S.Ct. 2893 (*quoting* 18 U.S.C. § 3575(e)). The court must consider such factors as "the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries." *Brandenburg,* 859 F.2d at 1185. However, the ultimate focus of the inquiry "must always be on whether the related predicate acts indicate ongoing criminal activity of sufficient scope and persistence to pose a special threat to social well-being." *Id.*

Plaintiffs have alleged that such is the case here. Feker allegedly obtains money by fraud and then funnels this money into whichever one of his companies is ailing at that particular time. For example, "[w]hen Feker received financing for improvements to the Dunes West property, he invested those earmarked funds into the acquisition of the Golden Ocala project, rather than pay for the improvements to the Dunes West project." (RCS at 73) Plaintiffs have alleged two specific examples, one involving an real estate project in Florida and another in South Carolina. The targeted victims of each scheme are different, but the method is similar. As Plaintiffs allege, "the same types of crimes ... [are] performed for the same purpose of illegally obtaining money from lenders." (RCS at 72) Indeed, Plaintiffs allege that such fraud continues to this day because it is Feker's method of doing business. As such, this court finds that the racketeering activities alleged reflect a sufficient continuity and relationship to each other to constitute a pattern. Because Plaintiffs allege that the income derived from these racketeering acts is diverted to operate other projects owned by Feker, and these projects affect interstate commerce,[8] Plaintiffs have stated a claim under § 1962(a).

### b. Injury to Business or Property Proximately Caused by Violation

 Under Fourth Circuit case law, Plaintiffs have standing to sue if they allege that their injuries were either (1) proximately caused by the predicate acts underlying the § 1962(a) violation, or (2) proximately caused by the investment and use of the illegally obtained income. *See Busby v. Crown Supply, Inc.,* 896 F.2d 833, 837–40 (4th Cir.1990).[9] Each Plaintiff will be ana-

---

**8.** Feker and the entities he owns, which constitute the "enterprise," are allegedly engaged in activities that affect interstate commerce. For example, the properties are promoted nationally by advertising companies in a manner designed to reach the consumer public and draw business and investment to the different property developments. (RCS at 84) Also, individuals from California, Georgia, and South Carolina have been fraudulently induced into accepting employment with the enterprise. (RCS at 85)

**9.** In *Busby,* the court created a circuit split by disagreeing with all the other circuits that had addressed the issue of whether a § 1962(a) civil RICO claim should be dismissed when the plaintiff failed to allege an injury flowing from the defendant's investment or use of income. *See Busby,* 896 F.2d at 836. The other circuits based their opinions on an analysis of the language of § 1962(a) and § 1964(c). Section 1962(a) prohibits a person who has received income derived from a pattern of racketeering activity from using or investing that income in an enterprise. *See* 18 U.S.C. § 1962(a) (1994). Section 1964(c) provides only a civil remedy to those persons injured "by reason of a *violation of section 1962.*" *See* 18 U.S.C. § 1964(c) (1994) (emphasis added). Because § 1962(a) prohibits investment of the income and not the racketeering acts themselves, the Second, Third, Fifth, Sixth, Ninth, Tenth, and D.C. Circuits have all held that a plaintiff seeking civil damages for a violation of § 1962(a) must plead facts showing that the plaintiff was injured by the use or investment of racketeering income. *See Vemco, Inc. v. Camardella,* 23 F.3d 129, 132 (6th Cir.1994); *Nugget Hydroelectric v. Pacific Gas & Elec.,* 981 F.2d 429, 437–38 (9th Cir.1992); *Parker & Parsley Petroleum v. Dresser Indus.,* 972 F.2d 580, 584

lyzed separately for both theories of injury. First, to the extent that Plaintiff Ahmad Sadighi alleged that he was injured by the underlying predicate acts, he has shown insufficient nexus between his injury and the predicate acts. On page 42 and page 56 of the RICO Case Statement, for example, Sadighi alleges that he refused to sign documents that would have associated his name with mail or wire fraud predicate acts. The court has found no other allegation that Sadighi unknowingly participated in a predicate act to the extent that his good name could be jeopardized by such an association.

However, Sadighi can still state a claim for a violation of § 1962(a) because he has two other theories of recovery, one of which is viable. Sadighi's allegations advance the theory that he suffered injury to his business or property as a result of the investment or use of the income derived from racketeering when the money Feker obtained through predicate acts was invested into the enterprise instead of being used to pay him. (RCS at 67, 69). Although the Fourth Circuit noted that plaintiffs would have standing to state a § 1962(a) claim if they had been "injured by the investment and use of the illegally obtained income," *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 837 (4th Cir. 1990), Sadighi's claimed injury, that he was not paid, has an insufficient nexus with Feker's investment of the illegally obtained money. Sadighi stands in the same shoes as any other person owed money by Feker. To hold that all such persons were proximately injured by Feker's investment of the illegally obtained money would "open the door to 'massive and complex' damages litigation[, which would] not only 'burde[n] the courts, but [would] also undermin[e] the effective-

ness of treble-damages suits." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 274, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (alteration in original) (*quoting Associated General Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 545, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). Consequently, this court finds that any injury Sadighi might have suffered based purely on his expectation of payment for services was not proximately caused by a § 1962(a) violation.

Sadighi's remaining theory of recovery under § 1962(a) is viable. Sadighi allegedly had a profit percentage agreement with Feker in that Sadighi was to receive 15% of the profits of Allied Construction & Engineering, Inc. (RCS at 106) Furthermore, Sadighi was performing services in return "for a percentage of the sales or profits on the Dunes West and Hunter's Ridge development projects." (RCS at 102) "By siphoning the Dunes West and Hunter's Ridge funds out of these projects and into the Golden Ocala project, Feker harmed [Sadighi] by preventing the improvements on which [Sadighi's] profit percentages depended from being completed and paid for." (RCS at 103) In fact, "by defrauding GALIC, Feker placed the financing of the entire project in jeopardy." (RCS at 103) Thus, when Feker allegedly diverted the income derived from his predicate racketeering acts to other projects, Sadighi and Allied suffered injury because the projects in which they had a property interest could not realize profit "unless significant funds were invested in those projects and the necessary improvements to those projects were completed and paid for." (RCS at 102–03) Unlike Sadighi's general claim that he was injured when Feker failed

---

(5th Cir.1992); *Danielsen v. Burnside–Ott Training Ctr.*, 941 F.2d 1220, 1229–30 (D.C.Cir.1991); *Ouaknine v. MacFarlane*, 897 F.2d 75, 82 (2d Cir.1990); *Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147, 1149–51 (10th Cir.1989). Recognizing the contrary authority, the Fourth Circuit nevertheless "decline[d] to read an 'investment use' rule into the opaquely drafted § 1964(c)." *Busby*, 896 F.2d at 838. Instead, the court noted that "individuals may be injured by the investment and use of the illegally obtained income, [but that] this is not the only injury that plaintiffs sustain 'by reason of' a section 1962(a) violation." *Id.* at 837. Injury caused by predicate

racketeering acts is also sufficient to state a § 1962(a) violation. *Id.* at 837–40. Consequently, in the Fourth Circuit, plaintiffs have standing to allege a § 1962(a) claim when their injuries were proximately caused by either the underlying predicate acts or the investment and use of the income derived from the predicate acts. Although no other circuit has adopted the Fourth Circuit's rule and, in fact, it has been widely and persuasively criticized by other circuit and district courts, the decision is binding on this court. When presented with binding Fourth Circuit precedent, district courts, like obedient children, should be seen and not heard.

to pay him, this profit percentage claim is specifically tied to the investment of racketeering income. Consequently, this court finds that the injury was proximately caused by such an investment in other projects so that Sadighi and Allied [10] have sufficiently stated a claim for a violation of § 1962(a).

Second, Plaintiff Charles E. Riggins has also alleged that he was injured by Defendants' violation of § 1962(a). For the same reasons that Feker's failure to pay Sadighi was not a compensable claim under this RICO subsection, Riggins' claim for an injury caused by Feker's investment of the racketeering income also fails. (RCS at 62) However, Riggins has properly alleged an injury to his professional reputation caused by Defendants' § 1962(a) violation. See Khurana v. Innovative Health Care Sys., Inc., 130 F.3d 143, 151 (5th Cir.1997) (finding that damage to plaintiff's professional reputation was a compensable injury to business or property). In the RICO Case Statement, Riggins alleges that he sent documents and a cover letter supporting legitimate loan draw requests to GALIC. (RCS at 60) At Feker's request, Joseph Korosec allegedly combined these legitimate documents with forged receipts, invoices, and checks that Feker had faxed to him in order to obtain fraudulent reimbursement of money related to Mount Pleasant Waterworks and Sewer Commission fees. (RCS at 60) The legitimate and illegitimate expenses were allegedly sent by wire and by mail under Riggins' cover memo for one loan draw request. (RCS at 60) According to the RICO Case Statement,

[t]he manner in which the loan draw request was assembled and mailed as a single package by Airborne Express by Joseph T. Korosec from his office in Norcross, Georgia to the GALIC home office in St. Louis, Missouri, made it appear as if the entire May loan draw request was one, submission that had been legitimately submitted by certified public accountant Riggins in his official capacity as the Dunes West Comptroller. This mailing by Joseph T. Korosec at the direction of Feker was a predicate act of mail fraud by use of a 'private or commercial interstate carrier,' namely Airborne Express.

(RCS 61) This predicate act of mail fraud proximately injured Riggins because any injury he suffered as a result of the association of his name with this act of mail fraud is both a direct and foreseeable result of such an act.[11] Consequently, Riggins has stated a claim for a violation of § 1962(a).

Third, Plaintiffs Robert E. Miller and Miller Development Group have alleged that they were injured by Defendants' violation of § 1962(a). Miller alleges that he was injured when Feker used the money that should have gone to pay him to bribe GALIC employee Joseph T. Korosec and to gain favor with Neel Keenan. (RCS at 68) For the same reasons that this theory of recovery failed for Sadighi and Riggins, this theory fails for Miller. Miller and Miller Development Group do state a cognizable claim under § 1962(a) by alleging that Feker had a joint venture agreement with them relating to the acquisition of the Dunes West project. (RCS at 108) Under this purported agreement, Miller and his company were to receive a 10% ownership interest in the limited liability company to be formed to own the Dunes West project, 10% of the profits, $120,000 salary, and 3% of gross sales over $5 million per year. (RCS at 108) When Feker obtained funds from GALIC by mail and wire fraud for the supposed purpose of making improvements at Dunes West and then diverted those funds to the Golden Ocala project in Florida, Miller and Miller Development Group were proximately injured by the investment of income derived from racketeering. The misapplication of those funds

10. The court has found no cognizable § 1962(a) injury suffered by Sadighi's former companies, Pacific Poly Pro and Energy Engineering & Construction. Consequently, those companies have failed to state a claim for relief based upon a violation of § 1962(a); to the extent that they alleged such a claim, it is dismissed without prejudice.

11. Plaintiffs allege that the inference is that Riggins, a legitimate employee, was responsible for these matters. Such an inference could cause harm to his reputation. (RCS at 96)

harmed Miller and his company because the funds were obtained in order "to make capital improvements at Dunes West thereby increasing the value of his joint [venture] interest." (RCS at 102) Consequently, both Miller and Miller Development Group have stated a claim for a violation of § 1962(a).

Fourth, Plaintiff Cynthia Joy NeSmith has alleged that she was injured by Defendants' violation of § 1962(a). For the same reasons that Feker's failure to pay Sadighi, Riggins, and Miller was not a compensable claim under this RICO subsection, NeSmith's claim for an injury caused by Feker's investment of the racketeering income also fails. NeSmith does state a claim for an injury to her reputation that flows directly from the commission of a predicate act. Like Riggins, NeSmith's name was associated with the mail and wire fraud on GALIC when both legitimate and illegitimate loan draw requests were submitted. To keep his name out of the fraud, Feker caused GALIC to wire the funds to the attention of NeSmith. (RCS at 91) Her name was thus associated with the alleged mail and wire fraud perpetrated by Feker and Korosec as outlined above in the discussion of Riggins' § 1962(a) claims. Consequently, NeSmith has stated a claim for a violation of § 1962(a).

### 3. 18 U.S.C. § 1962(b)

#### a. Alleging a Violation

■ To state a claim under § 1962(b), Plaintiffs must allege that (1) a defendant person (2) acquired or maintained any interest in or control of (3) an enterprise engaged in, or the activities of which affect, interstate or foreign commerce (4) through a pattern of racketeering activity. *See* 18 U.S.C. § 1962(b) (1994). In short, § 1962(b) prohibits a person engaging in a pattern of racketeering for the purpose of acquiring or maintaining an interest in an enterprise.

■ Plaintiffs have alleged that Feker maintained his interest and control over his companies, which constitute the RICO enterprise, by

(a) the fraudulent hiring of

(b) law abiding professionals

(c) to work for his fraud-ridden and unethical business enterprises

(d) all the while secretly intending to use them

(e) unwittingly as disposable "front men" and "window dressing"

(f) to carry out his persistent pattern of outrageous criminal schemes

(g) in a way designed to shield Feker himself from personal scrutiny and criminal culpability

(h) at the expense of the business and financial livelihood of the professionals whose honest hard work allowed Feker to conduct his day to day business operations with an appearance of legitimacy; and

(i) all of whom were terminated when their termination became necessary to complete the commission of Feker's fraudulent acts.

(RCS at 2) They "were all hired by the Feker Defendants to perform one or more of the tasks necessary for the acquisition, operation and control of one or more of the real estate projects owned by the Feker Defendants." (RCS at 5) The hiring of such professionals is essential to the operation of the enterprise because Feker allegedly lacks the business experience and acumen needed to acquire and operate these residential properties. (Compl.¶ 38(C)(1)) Plaintiffs allege that their hiring amounted to mail or wire fraud because Feker made false promises to each of them via mail or facsimile that they would be engaged in legitimate employment. (RCS at 51, 69, 70, and 90) Such fraud occurred at the time each offer of employment was extended by Feker to each of the individual Plaintiffs. (RCS at 103–04) Mail or wire fraud requires "(1) a scheme disclosing an intent to defraud, and (2) the use of the mails [or wire] in furtherance of the scheme." *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir.1996); *see also* 18 U.S.C. § 1341 (1994) (mail fraud); 18 U.S.C. § 1343 (1994) (wire fraud). Fraudulently inducing employment by wire or the mails is sufficient to state a claim that Feker committed the RICO predicate acts of mail or wire fraud. *See Khurana v. Innovative Health Care Sys., Inc.*, 130 F.3d 143, 150–52 (5th Cir.1997). The hiring of Plaintiffs at different times, but in the same manner, by making false prom-

ises of legitimate employment via mail or wire leads this court to find that Plaintiffs have sufficiently alleged the elements of continuity and relationship to establish a pattern of racketeering activity. Consequently, Plaintiffs have stated a claim that Defendants violated § 1962(b).

### b. Injury to Business or Property Proximately Caused by Violation

To establish standing based on a § 1962(b) violation, a valid RICO injury must flow from the predicate acts that underpin the § 1962(b) violation. *See, e.g., Khurana v. Innovative Health Care Sys., Inc.,* 130 F.3d 143, 150 (5th Cir.1997). Plaintiffs allege that they were fraudulently induced to accept what Feker represented to be legitimate employment via mail and wire fraud. (RCS at 89) Loss of business opportunities and damage to professional reputation by fraudulent hiring and harmful employment associations constitute cognizable injuries to business or property, so long as the injuries were proximately caused by predicate racketeering acts such as mail or wire fraud. *See id.* at 150–52. The Fourth Circuit requires that when the

> predicate act giving rise to civil liability under RICO [is] alleged to have been mail [or wire] fraud, prospective plaintiffs must, in order to demonstrate their standing to sue, plausibly allege both that they detrimentally relied in some way on the fraudulent mailing [or wiring], and that the mailing [or wiring] was a proximate cause of the alleged injury to their business or property.

*Chisolm v. TranSouth Fin. Corp.,* 95 F.3d 331, 337 (4th Cir.1996). In other words, Plaintiffs must have justifiably relied to their detriment on Feker's material misrepresentations. *See id.* Such "a showing of reliance on the predicate act of fraud ensures the existence of a 'direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* (*quoting Caviness v. Derand Resources Corp.,* 983 F.2d 1295, 1305 (4th Cir.1993)). Each Plaintiff and his associated corporate entity, if any, will be considered separately to determine whether fraudulently

hiring them proximately caused their injuries.

First, Plaintiff Sadighi, Pacific Poly Pro, Energy Engineering & Construction, and Allied Construction & Engineering have all alleged claims under § 1962(b). Sadighi has a claim under § 1962(b) for professional reputation damages. Sadighi is an engineer and construction professional. (RCS at 3, 104) Feker allegedly made false promises to Sadighi by wire that he would provide Sadighi with legitimate employment and pay him for five years. (RCS at 69) Like the employee in *Khurana,* Sadighi relied on the misrepresentations by relocating himself. He moved from California to Florida and subsequently from Florida to South Carolina, (RCS at 8, 97) "a significant financial and professional decision, allegedly as a result of [Feker's] misrepresentations as to the legitimacy of [his] operations." *Khurana v. Innovative Health Care Sys., Inc.,* 130 F.3d 143, 151 (5th Cir.1997); *see also Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.,* 985 F.2d 102, 104–05 (2d Cir.1993) (finding that plaintiffs had standing because, in the fraudulently induced belief that racing at a particular race track would continue, they purchased, relocated and reconstructed equipment for use at the track and designed their purchases and training of horses with the intention that they would race them at the track). Also like the employee in *Khurana,* potential damage to Sadighi's professional reputation was a foreseeable result of his fraudulent hiring as a key player in the allegedly fraud-ridden organization and his association with Feker's allegedly fraudulent practices. *See Khurana,* 130 F.3d at 151. "The act of fraudulently hiring him can be a proximate cause of any damage that his professional reputation has suffered. Damage to his professional reputation is easily seen as a natural outgrowth of such an employment association." *Id.* Because a predicate act of wire fraud preceded Sadighi's acceptance of employment with Feker, the "pleadings presented the necessary proximate cause for [Sadighi's] standing for this claim." *Id.* Consequently, Sadighi has stated a claim under § 1962(b) for professional reputation damages.

■ Plaintiffs Sadighi, Pacific Poly Pro, and Energy Engineering & Construction have standing to assert a claim under § 1962(b) for loss of business opportunities.[12] Like the employee in *Khurana*, these Plaintiffs each alleged a loss of legitimate employment opportunities resulting from the predicate act of fraudulent inducement via wire. When Feker allegedly induced Sadighi to work for him, Feker transmitted a promise via wire that he and Sadighi would form a company to perform all construction and construction management as to the properties owned by Feker. (RCS at 69, 96–97) As a shareholder of the newly formed Allied Construction & Engineering, Inc., Sadighi would receive "15% of the proceeds from management of the various Feker real estate ventures." (RCS at 70) In consideration for this employment opportunity, Sadighi was to "close out his two existing businesses and devote his full time efforts to Feker's interests." (RCS at 70) In reliance on these false promises, Sadighi discontinued the business of his two companies, Pacific Poly Pro and Energy Engineering & Construction, Inc. (RCS at 97–98) Plaintiffs' allegations of "reliance on [Feker's] racketeering acts as a cause of this injury indicates a valid claim that the racketeering acts proximately caused [them] to forego other legitimate business opportunities." *Khurana v. Innovative Health Care Sys., Inc.*, 130 F.3d 143, 152 (5th Cir.1997). Plaintiffs' loss of employment opportunities was a foreseeable result, and a natural consequence, of Feker's alleged misrepresentations. *Id.* Consequently, Sadighi, Pacific Poly Pro, and Energy Engineering & Construction have stated a claim under § 1962(b) for loss of business opportunity damages.

■ Second, Charles E. Riggins has stated a claim under § 1962(b) for professional reputation damages and damages for loss of legitimate employment opportunities. Riggins is a Certified Public Accountant who has alleged that he was fraudulently induced into employment with Feker by telephone communications. (RCS at 3, 18 n. 14) This fraudulent inducement allegedly included representations that the employment would only require Riggins "to undertake lawful actions in furtherance of the legitimate purposes of [his] employer's business." (RCS at 99) Riggins' decision to terminate his employment with Georgia–Pacific and enter Feker's employ evidenced his reliance on these representations. His employment as a corporate comptroller allegedly gave Feker's ownership and operation of the Dunes West and Hunter's Ridge properties the appearance of legitimacy and continuity because Riggins had been a comptroller for Georgia–Pacific from whom Feker purchased these properties. (RCS at 87, 90–91) His position as corporate comptroller for an allegedly fraud-ridden organization could foreseeably result in damage to his professional reputation. Moreover, "loss of other employment opportunities was foreseeable by [Feker] and could certainly be anticipated as a natural consequence of [his] alleged misrepresentations." *Khurana*, 130 F.3d at 152. Consequently, Riggins has stated a claim under § 1962(b) for loss of business opportunity damages and professional reputation damages.[13]

■ Third, Robert E. Miller and Miller Development Group have stated a claim for a violation of § 1962(b). Just as Feker retained control of an enterprise through the fraudulent hiring of employees such as Sadighi and Riggins, Feker was able to gain control of the Dunes West project, and thus acquire an interest in an enterprise, based on false representations transmitted via wire to Robert E. Miller. Miller is a licensed real estate broker and a professional real estate developer. (RCS at 3, 104) Miller alleges that he "was Feker's only local contact in the Charleston real estate market during this time [and so] Feker could not have closed the deal without Miller's involvement." (RCS at 20) Miller alleges that Feker and his attorney, J. Stephen Gardner, "made false promises to Plaintiff Miller by wire that they

---

12. Allied does not appear to have any damages as a result of a violation of § 1962(b). To the extent that this company has alleged such a claim, it is dismissed without prejudice.

13. As noted earlier, Riggins has also stated a § 1962(a) claim for professional reputation damages resulting from the association of his name with the GALIC reimbursement fraud.

would create a joint venture with Plaintiff Miller and Miller Development if Miller would devote his efforts to the acquisition of the Dunes West project for the joint venture." (RCS at 90) "Gardner repeatedly assured Miller by wire that Gardner would prepare a joint venture agreement as soon as the Dunes West Project closed when Gardner was in fact preparing documents conveying the project to a corporation controlled entirely by Feker." (RCS at 70) Miller further alleges that

> Feker continued to lure Miller into providing services related to Dunes West by sending or causing to be sent to Miller the following 'lulling letters':
>
> > (a) the March 2 letter of Gardner to William L. Covington at GP [Georgia–Pacific] which stated that:
> >
> > > This letter is to advise you that Robert E. Miller, Jr. of Miller Development Group, LLC is working with Allan Feker in connection with the acquisition of Dunes West and Hunter's Ridge.
> >
> > (b) the fax of March 9, 1998 from Feker to Tom Powers at GP which stated that:
> >
> > > Please let this memo serve to notify you that Bob Miller will be representing my interests in regards to the above transaction and has my full confidence and support.... Any questions from the public, the real estate or the homebuilding community should be referred directly to Bob [Miller] or Melinda McDonald.
> > >
> > > In addition, if you would contact the engineers, the contractors—Rogers & Sons, and any other appropriate party that Bob [Miller] may need to contact in order to verify information and let them know that it is okay for them to provide him with the requested information.

(RCS at 24–25) Miller alleges that he was injured as a result of these predicate acts of wire fraud. The wire fraud statute "encompasses use of ... wires after the initial ... transaction when such use is 'designed to lull the victim[ ] into a false sense of security.'" *Morley v. Cohen,* 888 F.2d 1006, 1009 (4th Cir.1989) (*quoting United States v. Maze,* 414 U.S. 395, 403, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974)). "The key is whether the communication occurred 'for the purpose of executing the scheme.'" *Id.* at 1010 (*quoting Kann v. United States,* 323 U.S. 88, 94, 65 S.Ct. 148, 89 L.Ed. 88 (1944)). The effect of these communications was to lull Miller into continuing to work on the Dunes West project with the expectation of a joint venture interest in the residential community. Thus, the wire transmissions promising to set up a joint venture and the subsequent "lulling letters" can serve as predicate acts of wire fraud. Based on all of these false representations transmitted by wire, Miller and Miller Development Group "gave up other opportunities to earn income to pursue the joint venture with Feker." (RCS at 19) Miller's reliance on these misrepresentations is evident from the fact that "Miller did nothing but work on the acquisition of Dunes West" from about mid-December 1997 until closing. (RCS at 19) Miller and Miller Development Group's "loss of other employment opportunities was foreseeable by [Feker] and could certainly be anticipated as a natural consequence of [his] alleged misrepresentations." *Khurana v. Innovative Health Care Sys., Inc.,* 130 F.3d 143, 152 (5th Cir.1997). One of these opportunities was to pursue purchasing the Dunes West project on his own or with persons other than Feker. (RCS at 87) Also, any professional reputation damages Miller, as an award-winning real estate developer, suffered because of his association with Feker's allegedly fraud-ridden organization was a foreseeable result of the false representations transmitted by wire. Consequently, Miller has stated a claim under § 1962(b) for professional reputation damages, and Miller and Miller Development Group have stated a claim for damages due to the loss of business opportunities.

■ Fourth, Cynthia Joy NeSmith has stated a claim under § 1962(b) for professional reputation damages and damages for loss of legitimate employment opportunities. NeSmith is a young college graduate with a business degree working toward her CPA license. (RCS at 3) NeSmith alleges that she was fraudulently induced to work for Feker by false promises transmitted via wire.

(RCS at 62, 91) After authorization by Feker, Riggins faxed NeSmith an Employment Confirmation Memorandum offering NeSmith employment with Feker. (RCS at 51) NeSmith was not told that Feker was engaged in criminal activities and that she "would be used to wire ... ill gotten monies to Feker for use on his other projects." (RCS at 51) In reliance on the promise of legitimate employment, "NeSmith accepted Feker's offer of employment and agreed to move from Georgia to South Carolina to begin work." (RCS at 51–52) NeSmith's position as a project accountant for an allegedly fraud-ridden organization could foreseeably result in damage to her professional reputation.

NeSmith can also state a claim under § 1962(b) for damages due to loss of legitimate employment opportunities. NeSmith alleges that her "ability to qualify for her CPA licensure was lengthened, and possibly truncated[,] by the fraudulent inducement of her employment, which failed to provide the direct supervision of a certified public accountant." (RCS at 99) When Feker fired Riggins, NeSmith was left "without the direct supervision of a CPA which Feker had promised at the time NeSmith was employed." (RCS at 108) Because NeSmith had 3½ years of her mandatory five year continuous apprenticeship completed when she went to work for Feker, she "may have lost 3½ years of work toward her CPA" because of Feker's fraudulent inducement. (RCS at 51 n. 38) Moreover, like Sadighi, Riggins, and Miller, NeSmith lost legitimate employment opportunities when she went to work for Feker. Such a loss was foreseeable and a natural consequence of his alleged misrepresentations regarding the legitimacy of employment. Consequently, NeSmith has stated a claim under § 1962(b) for professional reputation damages and damages for the loss of legitimate employment opportunities.

 This court agrees with those jurisdictions which have held that plaintiffs do not have standing to assert a civil RICO claim for *termination* damages when their termination flowed from their refusal to perform a predicate act or the likelihood that they would "blow the whistle" on the RICO fraud being perpetrated by the employer.

*See, e.g., Khurana v. Innovative Health Care Sys., Inc.,* 130 F.3d 143, 149 (5th Cir.1997) (termination of employee for refusal to participate in and attempting to stop the employer's RICO activities does not flow from the commission of predicate acts so that employee has no standing to assert a § 1962(b) or (c) claim); *Cullom v. Hibernia Nat'l Bank,* 859 F.2d 1211, 1212 (5th Cir.1988) ("[A]n employee discharged for refusing to participate in an illegal activity under RICO lacks standing to sue under section § 1964(c) [because t]he employee's injury was not 'by reason of' or did not 'flow from' the commission of the predicate acts on which the alleged RICO violation was based."); *Nodine v. Textron, Inc.,* 819 F.2d 347, 347 (1st Cir. 1987) ("[A]n employee discharged for reporting a criminal violation of his employer lacked standing to sue that employer under the RICO Act [because t]he discharge was not 'by reason of' the RICO violations alleged."); *Donohue v. Teamsters Local 282 Welfare, Pension, Annuity, Job Training & Vacation & Sick Leave Trust Funds,* 12 F.Supp.2d 273, 278 (E.D.N.Y.1998) ("[A] retaliatory termination does not confer RICO standing."); *Cardwell v. Sears Roebuck & Co.,* 821 F.Supp. 406, 409 (D.S.C.1993) (adopting the view of the majority of courts that discharging an employee for not participating in a RICO predicate offense does not confer RICO standing on the discharged employee because the termination was not proximately caused by the employer's commission of a predicate act). Sadighi and Riggins allege that they were fired to prevent the exposure of Feker's fraud. Even though they were fired by wire transmission, their terminations did not flow from the commission of predicate acts. As a result, these two Plaintiffs fail to state a § 1962(b) claim for termination damages. The court has not found any allegations by NeSmith or Miller that they were "terminated" by any action that constituted a predicate act. Consequently, all Plaintiffs' § 1962(b) claims for *termination* damages are dismissed without prejudice.

### 4. 18 U.S.C. § 1962(c)

#### a. Alleging a Violation

 To state a claim under § 1962(c), Plaintiffs must allege that (1) a defendant

person (2) employed or associated with (3) an enterprise, engaged in, or the activities of which affect, interstate or foreign commerce, (4) conducts or participates in the conduct of the affairs of the enterprise (5) through a pattern of racketeering activity. *See* 18 U.S.C. § 1962(c) (1994). In short, § 1962(c) prohibits a person employed or associated with an enterprise from conducting that enterprise through a pattern of racketeering activity. *See Palmetto State Med. Ctr. v. Operation Lifeline,* 117 F.3d 142, 148 (4th Cir.1997). The Fourth Circuit also mandates that "[t]he enterprise must be distinct from the persons alleged to have violated § 1962(c)." *Id.; see also New Beckley Mining Corp. v. International Union, UMW of America,* 18 F.3d 1161, 1165 (4th Cir.1994) (finding that the district court properly dismissed a § 1962(c) claim because the defendant persons were not distinct from the alleged enterprises). In their Second Amended RICO Case Statement, Plaintiffs indicate that they view Feker and the entities he owns "as a single entity and a single defendant and as the entity comprising the RICO 'enterprise' for purposes of Plaintiffs' 18 U.S.C. § 1962(c) claim." (RCS at 76) Elsewhere in the RICO Case Statement, Plaintiffs answered the following interrogatory from this court:

> 13b. State whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).
>
> *Response:* The Feker Enterprises comprising Feker and eighteen entities that are alleged to be alter egos of Feker and thereby constituting a *single legal entity constitute both the "enterprise" under 18 U.S.C. § 1962(c) and the liable "person"* whose assets would be sought to satisfy any judgment granted with regard to the RICO cause of action.

(RCS at 92–93) (emphasis added). Because Plaintiffs have not alleged an enterprise distinct from the liable person, this court dismisses Plaintiffs' § 1962(c) claim without prejudice.

### 5. 18 U.S.C. § 1962(d)

#### a. Alleging a Violation

 To state a claim under § 1962(d), Plaintiffs must allege that (1) a defendant person (2) conspired to violate one of the substantive provisions of §§ 1962(a), (b), or (c). *See* 18 U.S.C. § 1962(d) (1994); *Palmetto State Med. Ctr. v. Operation Lifeline,* 117 F.3d 142, 148 (4th Cir.1997). Based on the dismissal of Plaintiffs' § 1962(c) claims, Plaintiffs can only allege a conspiracy to violate § 1962(a) or (b). To state a claim under § 1962(d) for a conspiracy to violate § 1962(a), Plaintiffs must allege that Feker either conspired with another to invest income, derived from a pattern of racketeering, into the enterprise or conspired with another to commit predicate acts to obtain that income. *See* 18 U.S.C. §§ 1962(a), (d) (1994); *Busby v. Crown Supply, Inc.,* 896 F.2d 833, 837 (4th Cir.1990) (holding that a defendant may violate § 1962(a) by committing predicate acts or by investing the income derived from the predicate acts). To state a claim under § 1962(d) for a conspiracy to violate § 1962(b), Plaintiffs must allege that Feker conspired with another to engage in a pattern of racketeering activity for the purpose of acquiring or maintaining an interest in the enterprise. *See* 18 U.S.C. §§ 1962(b), (d) (1994). Each Plaintiff's ability to allege a violation of § 1962(d) will be briefly set out below.

First, even if Sadighi could allege a conspiracy to violate either § 1962(a) or (b), he does not have standing to sue under § 1962(d). For this reason, the court will analyze his claim in the next sub-section.

 Second, Robert E. Miller and Miller Development Group have not stated a claim for a violation of § 1962(d). Miller cannot state a § 1962(d) claim based on a conspiracy between Feker and his companies because he alleges that these Defendants are "a single entity." (RCS at 76) "A conspiracy by nature involves an agreement between two or more entities." *New Beckley Mining Corp. v. International Union, UMW of America,* 18 F.3d 1161, 1164 (4th Cir.1994). Instead, Miller has alleged that Feker conspired with his attorney, J. Stephen Gardner, and Feker's employee, Melinda McDonald, to obtain Miller's services for the acquisition of Dunes West (an enterprise) and then to cut Miller out of the Dunes West deal. (RCS at

23–23, 27) Miller alleges that Feker and Gardner committed numerous predicate acts of wire fraud to perpetrate this conspiracy. For example, Feker and Gardner made false promises via wire to obtain and retain Miller's services while the Dunes West deal was pending. (RCS at 43, 70, 90, 94) Miller was allegedly injured by these predicate acts because he continued to work on the Dunes West deal under the fraudulently induced belief that he was participating in a joint venture agreement with Feker. In reality, Feker had informed Gardner that "he intended to cut Miller out of the deal." (RCS at 43)

■ However, none of these allegations is sufficient to state a claim for a violation of § 1962(d) because, under the doctrine of intracorporate conspiracy, Feker cannot conspire with his corporations, his employee, Melinda McDonald, or with his attorney, Stephen Gardner. *See Huntingdon Life Sciences, Inc. v. Rokke,* 986 F.Supp. 982, 991 (E.D.Va.1997); *Broussard v. Meineke Discount Muffler Shops, Inc.,* 945 F.Supp. 901, 911–12 (W.D.N.C.1996), *rev'd on other grounds,* 155 F.3d 331 (4th Cir.1998); *cf New Beckley Mining Corp. v. International Union, UMW of America,* 18 F.3d 1161, 1164–65 (4th Cir.1994) (holding that an international union could not conspire with its districts, locals, and members because "[a] conspiracy by nature involves an agreement between two or more entities"); *Buschi v. Kirven,* 775 F.2d 1240, 1251–53 (4th Cir.1985) (expounding on the intracorporate conspiracy doctrine and noting that it applies to employees and agents of the corporation); *In re American Honda Motor Co. Dealerships Relations Litig.,* 958 F.Supp. 1045, 1056 (D.Md.1997) (noting that an argument that intracorporate

conspiracy is insufficient to state a claim under § 1962(d) as a matter of law "might have merit"). *But see Webster v. Omnitrition Int'l, Inc.,* 79 F.3d 776, 787 (9th Cir. 1996) (finding that intracorporate conspiracies were actionable under RICO and adopting the reasoning of the Seventh Circuit); *Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1281 (7th Cir.1989) (finding intracorporate conspiracies actionable under RICO because such conspiracies "threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers and separating racketeers from their profits").[14]

■ In *Broussard,* the Western District of North Carolina rejected the approach taken by the Seventh and Ninth Circuits in favor of an approach the court found to be more in harmony with the Fourth Circuit's prior case law regarding the intracorporate conspiracy doctrine. The court observed that the Fourth Circuit has relied on the doctrine of intracorporate conspiracy,[15] borrowed from anti-trust law, "in a myriad of areas of the law to dismiss complaints premised on an allegation that a corporation could conspire with itself." *Broussard,* 945 F.Supp. at 911. In fact, the court noted that such a rule "is a fundamental tenet of corporate law in the Fourth Circuit." *Id.* As such, the district court concluded that RICO did not "warrant[ ] disregarding this fundamental tenet as expressed by the Fourth Circuit." *Id.* Instead, the district court ruled that,

because a corporation can act only through its officers and agents, and because no entity can 'conspire' with itself, a corporate entity cannot 'conspire' with its own officers and employees. Thus, the better rule is that, for purposes of § 1962(d), a corpo-

---

**14.** Although two circuits have permitted § 1962(d) claims based on intracorporate conspiracies, district courts were about evenly divided on the issue when the Seventh Circuit found intracorporate conspiracies actionable under RICO. *See Ashland Oil, Inc.,* 875 F.2d at 1281 n. 10. More recently, the Western District of North Carolina was able to observe that "[t]he majority of cases find that a corporation cannot conspire with itself and, accordingly, dismiss § 1962(d) claims founded on an intracorporate conspiracy." *Broussard,* 945 F.Supp. at 911.

**15.** The Fourth Circuit has recognized two exceptions to this intracorporate conspiracy doctrine. *See Buschi v. Kirven,* 775 F.2d 1240, 1252 (4th Cir.1985). First, an exception may be justified when the officer has an independent personal stake in achieving the corporation's illegal objective. *Id.* No such a personal stake has been alleged by Plaintiffs. Second, a less well-recognized exception exists when the employee's acts are unauthorized. In this case, the contrary is alleged. Plaintiffs allege that Melinda McDonald and J. Stephen Gardner acted pursuant to Feker's instructions and authorization.

ration acting through its officers, even where the act is unlawful, does not constitute a 'conspiracy' for purposes of § 1962(d). *Id.* The Eastern District of Virginia agrees. *See Huntingdon Life Sciences, Inc. v. Rokke,* 986 F.Supp. 982, 991 (E.D.Va.1997). Again, a district court relied on Fourth Circuit precedent in finding that this circuit would not adopt the rationale of the Seventh and Ninth Circuits. *Id.* Moreover, citing to the broad language used by the Fourth Circuit in *Buschi,* the court found that the intracorporate conspiracy doctrine "cover[ed] not only officers and directors but also 'agents' of the corporation." *Id.* "Given the intracorporate conspiracy rule and the likelihood that the Fourth Circuit would apply it to a RICO claim," the court dismissed plaintiff's RICO conspiracy claim for failure to state a claim. *Id.* at 991–92.

A Fourth Circuit opinion not cited by either the Eastern District of Virginia or the Western District of North Carolina also provides support for this court's finding that the Fourth Circuit would apply the intracorporate conspiracy doctrine to bar Miller's § 1962(d) claim. *See New Beckley Mining Corp. v. International Union, UMW of America,* 18 F.3d 1161, 1164–65 (4th Cir. 1994). In *New Beckley Mining Corp.,* the Fourth Circuit addressed the issue of whether an international union could conspire with its local or district branches in violation of § 1962(d). *Id.* at 1164. Quoting from one of its earlier opinions, the court noted that it " 'would not take seriously, in the absence, at least, of very explicit statutory language, an assertion that a defendant could conspire with his right arm, which held, aimed and fired the fatal weapon.' " *Id.* (*quoting United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1190 (4th Cir.1982)). Because "[a] conspiracy by nature involves an agreement between two or more entities," the court of appeals concluded that "[i]nasmuch as the complaint alleged that the International [union], 'its officers, directors, employees, agents, subagents, and any other person or entity acting on the counsel, command, induc-

tion, procurement, instigation or direction of the International' conspired with the districts and locals, the [RICO] conspiracy counts cannot stand." *Id.* at 1164–65.

■ Similarly, in this case, Miller's § 1962(d) claim cannot stand. Plaintiffs have alleged that Feker, his employee, Melinda McDonald, and Feker's attorney, J. Stephen Gardner,[16] participated in the alleged conspiracy. Under the intracorporate conspiracy doctrine and the facts as alleged by Plaintiffs, Feker cannot conspire to violate RICO with himself, his corporations, his employee, or his agent. Consequently, this court will dismiss Miller and Miller Development Group's § 1962(d) claim without prejudice.

Third, even though Plaintiffs NeSmith and Riggins may have proximately suffered reputation damages as a result of their association with the predicate acts of wire fraud allegedly committed by Feker and Joseph T. Korosec when fraudulently obtaining money from GALIC, the court could find no specific allegations by these Plaintiffs that Korosec and Feker conspired together to injure them. To the extent that these Plaintiffs suffered such an injury but did not sufficiently plead a violation of § 1962(d), this court dismisses their claims without prejudice.

**b. Injury to Business or Property Proximately Caused by Violation**

■ The circuits are split on the issue of whether RICO standing for a violation of § 1962(d) must be based on an injury proximately caused by a predicate act or whether such a claim may be premised on injury proximately caused by overt acts in furtherance of the conspiracy that do not necessarily constitute predicate acts. *Compare Beck v. Prupis,* 162 F.3d 1090, 1097–99, 1998 WL 870253 (11th Cir.1998) (holding that in a civil RICO claim under § 1962(d), a plaintiff's injuries must be proximately caused by an act of racketeering and not merely an act in furtherance of the conspiracy), *and Bowman v. Western Auto Supply Co.,* 985 F.2d 383, 388 (8th Cir.1993) ("We hold that standing to

---

**16.** "Generally[,] an attorney is an agent for his client." *In re Brugh's Estate,* 306 So.2d 599, 600 (Fla.App.1975).

bring a civil suit pursuant to 18 U.S.C. § 1964(c) and based on an underlying conspiracy violation of 18 U.S.C. § 1962(d) is limited to those individuals who have been harmed by a § 1961(1) RICO predicate act committed in furtherance of a conspiracy to violate RICO."), *and Miranda v. Ponce Fed. Bank,* 948 F.2d 41, 48 (1st Cir.1991) ("An actionable claim under section 1962(d) ... requires that the [plaintiff's] injury stem from a predicate act within the purview of 18 U.S.C. § 1961(1)."), *and Reddy v. Litton Indus., Inc.,* 912 F.2d 291, 295 (9th Cir.1990) (adopting the rule that predicate acts are necessary), *and Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25 (2d Cir.1990) ("[S]tanding may be founded only upon injury from overt acts that are also section 1961 predicate acts, and not upon any and all overt acts furthering a RICO conspiracy."), *with Khurana v. Innovative Health Care Sys., Inc.,* 130 F.3d 143, 152–154 (5th Cir. 1997) ("A person injured by an overt act in furtherance of a RICO conspiracy has been injured by reason of the conspiracy, and thus has § 1964(c) standing."), *and Schiffels v. Kemper Fin. Servs., Inc.,* 978 F.2d 344, 351 (7th Cir.1992) ("[Plaintiff] ... has standing to sue under RICO if her complaint alleges an injury to her business or property proximately caused by an overt act in furtherance of a conspiracy to violate RICO, even though the overt act is not a predicate act required in a RICO pattern."), *and Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1169–70 (3d Cir.1989) (holding that an allegation of injury resulting from an act in furtherance of a RICO conspiracy states a cause of action). The Fourth Circuit has not yet ruled on this issue.

This court must predict which view the Fourth Circuit would adopt. In the language of the Fifth Circuit, the minority view may be stated as follows:

[s]ince § 1962(d) does not require that a predicate racketeering act actually be committed,[17] it follows that the act causing a § 1964(c) claimant's injury need not be a predicate act of racketeering. A person injured by an overt act in furtherance of a RICO conspiracy has been injured by reason of the conspiracy, and thus has § 1964(c) standing.

*Khurana,* 130 F.3d at 153. Conversely, the majority of circuits have held that because RICO targets only racketeering activity (and not all unlawful acts), only those injuries that are proximately caused by racketeering activities, that is, the predicate acts catalogued under § 1961(1), should be actionable under the RICO statute. *See, e.g., Beck v. Prupis,* 162 F.3d at 1097–99, 1998 WL 870253 (11th Cir.1998). Although the minority view appears persuasive, language in prior Fourth Circuit case law persuades this court that the Fourth Circuit would follow the view expressed by the majority of circuits. In *Brandenburg v. Seidel,* 859 F.2d 1179 (4th Cir.1988), the Fourth Circuit addressed the issue of RICO standing. To have standing, the court noted that a plaintiff had to show "(1) that he has suffered injury to his business or property; and (2) that this injury was *caused by the predicate acts* of racketeering activity that make up the violation of § 1962." *Id.* at 1187 (emphasis added). The court further indicated that the Supreme Court's standing requirement mandated "an adequate causal nexus between [the] injury and the *predicate acts* of racketeering activity alleged." *Id.* (emphasis added). More specifically, the court stated that " § 1964(c) provides *no cause of action* to individuals injured by conduct *other than predicate acts* of racketeering activity." *Id.* at 1188 (emphasis added).

Subsequently, the Fourth Circuit addressed the issue of RICO standing and causation in the specific context of a § 1962(a) claim. *See Busby v. Crown Supply, Inc.,* 896 F.2d 833 (4th Cir.1990). In *Busby,* the Fourth Circuit applied to a § 1962(a) claim the United States Supreme Court's ruling in *Sedima* that RICO plaintiffs had standing so long as their injuries were proximately caused by racketeering activities. *Id.* at 839. The Supreme Court held that "[a]ny recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts." *Sedima v. Imrex*

---

17. Again, § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d) (1994).

*Co.,* 473 U.S. 479, 497, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Quoting from *Sedima,* the Fourth Circuit recognized that " '[i]f the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the *racketeering activities*[18] *injure the plaintiff* in his business or property, the plaintiff has a claim under section 1964(c) [the civil RICO provision].' " *Busby,* 896 F.2d at 839 *(emphasis added)* ( quoting *Sedima,* 473 U.S. at 495, 105 S.Ct. 3275). Although the court of appeals acknowledged that the complaint in *Sedima* was filed under § 1962(c), the Fourth Circuit noted that "it is clear that the Supreme Court was referring to *§ 1962 as a whole.*" *Id. (emphasis added).* Following the Fourth Circuit's logic, if *Sedima* was referring to § 1962 as a whole, then the Supreme Court was making no distinction between the standing and causation requirements for claims under the substantive provisions of § 1962 and the conspiracy provision of that section. Although this court finds the simplicity of the minority view persuasive, it divines from the above-quoted language that the Fourth Circuit would follow the lead of the majority of circuits and require a RICO plaintiff to allege injury caused by a predicate act in order to have standing to sue for a RICO conspiracy claim under § 1962(d).[19] Because Miller, Riggins, and NeSmith did not sufficiently allege a RICO conspiracy, only Plaintiff Sadighi's claim will be analyzed below to determine whether his injury was proximately caused by a predicate act.

Plaintiff Sadighi alleges that Feker conspired with Douglas J. Sealy, Brett Sealy, and Prager, McCarthy & Sealy, Inc. in violation of § 1962(d). Even assuming that Feker and the Sealys agreed to commit any of the predicate acts that would violate either § 1962(a) or (b), Sadighi has not alleged that he was injured by the commission of a predicate act.[20] Sadighi alleges that "Feker conspired with the Sealy Defendants to oust Sadighi from Allied and from his involvement with the Golden Ocala project. In furtherance of that conspiracy, Sadighi was transferred from Golden Ocala to Dunes West." (RCS at 14) He was ultimately "fired as a result of this scheme." (RCS at 37) Sadighi does not allege that the acts of ousting him from Allied, transferring him from Florida to South Carolina, or terminating his employment were predicate acts. As a result, Sadighi cannot rely on these acts to state a claim for a § 1962(d) violation,[21] and thus his conspiracy claim is dismissed without prejudice.[22]

## C. Motion to Dismiss Breach of Contract Claims

■ Defendants argue[23] that the breach of contract claims must be dismissed with prejudice because Plaintiffs must be employees at will as they did not plead that they were employees for term. Sadighi alleged

---

**18.** The Supreme Court noted in *Sedima* that " 'racketeering activity' consists of no more and no less than commission of a predicate act." *Sedima,* 473 U.S. at 495, 105 S.Ct. 3275.

**19.** In doing so, this court is aware of contrary authority. *See Flinders v. Datasec Corp.,* 742 F.Supp. 929 (E.D.Va.1990). In *Flinders,* the district court, relying purely on the arguments made in other circuits, found the minority view persuasive. *Id.* at 933–34. The court failed to consider any language of Fourth Circuit precedent that may indicate how the Fourth Circuit would decide this issue.

**20.** All Plaintiffs allege that Feker and the Sealys conspired together to create a Preliminary Limited Offering Memorandum containing false statements, which was subsequently disseminated by mail. (RCS at 37) However, no Plaintiff has alleged any injury proximately caused by the dissemination of false information in this preliminary bond offering memorandum.

**21.** The court notes that the Fifth Circuit's analysis of § 1962(d) in *Khurana* is inapposite because its finding that the employee had standing to sue for a § 1962(d) violation was based on its holding that an injury caused by any act in furtherance of the conspiracy was sufficient to confer standing on the employee. *See Khurana v. Innovative Health Care Sys., Inc.,* 130 F.3d 143, 152–54 (5th Cir.1997).

**22.** To the extent that Allied, Pacific Poly Pro, or Energy Engineering & Construction alleged a conspiracy claim, their claims are also dismissed without prejudice because they too failed to allege an injury proximately caused by a predicate act.

**23.** Defendants' argument on this point consisted of a single sentence.

that he had an employment contract for at least five years. (Compl. ¶ 42) Miller claims a joint venture agreement with Feker that was confirmed by Miller in writing and that was awaiting final preparation by Gardner whom Miller alleges was acting as the joint venture attorney. (Comp. ¶ 51 & RCS at 43) Riggins alleges that he had a contract with Feker under which he could not be terminated, except for cause, until September 26, 1998. (Comp. ¶ 100 & Ex. 23) NeSmith alleges that she "had an employment agreement with Feker and Feker Enterprises." (Compl. ¶ 110) At the pleading stage, this is allegation is sufficient to survive a motion to dismiss because Defendants have cited no case law that requires a plaintiff to allege that the employment agreement was for a specific term. Consequently, Defendants' Motion to Dismiss the contract claims is denied.

### D. Motion to Dismiss Tortious Interference With Employment Contract Claim

Defendants argue that this claim must be dismissed with prejudice because an employer is absolutely entitled to terminate his employees.[24] Like Defendants, this court will not waste much space in addressing this issue. The court refers Defendants to the previous section.

### E. Motion to Dismiss Title VII Claim

Defendants argue that Cynthia Joy NeSmith's Title VII cause of action against Feker should be dismissed because NeSmith did not allege that she had filed a charge with the EEOC and received a right-to-sue letter, which is essential to the initiation of a Title VII suit in federal court. *See, e.g., Booth v. North Carolina Dep't of Env't, Health & Natural Resources,* 899 F.Supp. 1457 (E.D.N.C.1995).

■ After the Complaint was filed in this case, the EEOC issued NeSmith a right to sue letter. A plaintiff who files a Title VII cause of action without obtaining a right to sue letter from the EEOC can cure such a defect by subsequently obtaining a right to

sue letter. *See Henderson v. Eastern Freight Ways, Inc.,* 460 F.2d 258 (4th Cir. 1972); *see also Edwards v. Occidental Chem. Corp.,* 892 F.2d 1442, 1445 n. 1 (9th Cir.1990); *Gooding v. Warner–Lambert Co.,* 744 F.2d 354, 358 (3d Cir.1984); *Williams v. Washington Metro. Area Auth.,* 721 F.2d 1412, 1418 (D.C.Cir.1983). Therefore, this court will not dismiss the Title VII cause of action on the grounds that no right to sue letter was issued before the Complaint was filed.

### F. Motion to Dismiss South Carolina Unfair Trade Practices Claim (SCUTPA)

■ Defendants move to dismiss Plaintiffs' unfair trade practices cause of action for two reasons. First, Defendants argue that Plaintiffs failed to plead that Defendants' conduct had an adverse impact on the public interest. *See Daisy Outdoor Adver. Co. v. Abbott,* 322 S.C. 489, 473 S.E.2d 47, 49 (1996). Plaintiffs Sadighi, Riggins, Miller, and NeSmith alleged that Feker and his companies have "engaged in unfair ... methods of competition and unfair and unlawful deceptive acts or practices in the conduct of [their] business.... Said conduct ... constitute[s] a pattern or practice of unlawful conduct capable of repetition." (Compl. ¶ 113) Plaintiffs did not use the magic language "adverse impact on the public interest." However, Plaintiffs' use of the phrase "capable of repetition" is sufficient to put Defendants on notice that they are claiming an adverse impact on the public interest because "[p]rior case law makes very clear that evidence of a potential for repetition ... in and of itself establishes the required public impact." *Daisy Outdoor Adver. Co.,* 473 S.E.2d at 51.

■ Second, Defendants argue that the cause of action should be dismissed because the Unfair Trade Practices Act does not apply to an employer-employee relationship. *See Miller v. Fairfield Communities, Inc.,* 299 S.C. 23, 382 S.E.2d 16, 20 (App.1989). In *Miller,* the South Carolina Court of Appeals held that "an employer-employee relations matter ... is not covered by the Unfair Trade Practices Act." *Id.* at 20. Plaintiffs acknowledge *Miller,* but they ar-

---

**24.** Again, Defendants' argument on this point consisted of a single sentence.

gue that the SCUTPA claim should not be dismissed because "Plaintiff Sadighi claims an ownership interest in Allied, a company damaged by Feker's unfair and deceptive acts and practices, and Plaintiff Miller claims an ownership interest in the Dunes West Joint venture." (Pl.Memo. in Opposition at 38) Certainly, these facts take Miller and Sadighi out of the realm of a pure employer-employee relationship so that *Miller* does not foreclose their assertion of a SCUTPA claim. However, Plaintiffs Riggins and NeSmith make no such an argument and the pleadings reveal only an employer-employee relationship between Feker and these two Plaintiffs. Consequently, the SCUTPA claims of Riggins and NeSmith are dismissed without prejudice.

### G. Plaintiffs' "Alter Ego" Allegations

■ Plaintiffs allege that the corporate Defendants are Feker's alter egos, or, in the alternative, entities so under his control and influence that they engage in actions that they are used by him for his own purposes. (Compl.¶¶ 10–27) For example, Plaintiffs allege that Feker does not hesitate to use funds "owned" by one corporation to pay the debts of another or Feker's own personal expenses. (RCS at 72–73) Employees of each corporation are used interchangeably and "[t]here is no formal documentation of intercorporate transactions or dividends for the payment of personal expenses and no attempt to respect the property rights of the individual corporate entities." (RCS at 73) Plaintiffs have sufficiently plead the "alter ego" doctrine so as to place Defendants on notice that the doctrine is at issue in this case.

### H. Motion to Strike Allegations of Conduct By Agents of Feker

■ Defendants' seek to strike many of the RICO allegations including references to the Georgia–Pacific scheme, the GALIC scheme, the Dunes West scheme, the fraudulent misuse of Miller's work-product, and the forgery and wire cover-up scheme because Plaintiffs were not injured by these actions. However, the court has already found that some Plaintiffs could allege an injury caused by these schemes. For those schemes by which Plaintiffs were not injured, the Plaintiffs may allege them to demonstrate a "pattern of racketeering activity" in light of the Fourth Circuit's decision declining to apply the RICO statute when the predicate acts involve a single scheme limited in scope to the accomplishment of a single discrete objective. *See Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir.1988), *overruled on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). Consequently, the motion to strike these allegations is denied.

■ Defendants also seek to strike all references to Feker's attorney, J. Stephen Gardner. However, Plaintiffs Complaint may refer to non-Defendants such as Gardner because they allege that, upon instructions from Feker, he committed predicate acts demonstrating a pattern of racketeering activity.

■ Finally, Defendants seek to strike references in the Complaint to a group of foreign investors and to Feker's former Iranian citizenship. As to the former, Plaintiffs allege that the demands of this silent group of investors may be one of the reasons that Feker feels compelled to turn to extra-legal methods for acquisition and financing of real estate properties. In contrast, Feker's former Iranian citizenship has no apparent relevance to this case. Consequently, the motion to strike the allegations regarding foreign investors is denied, whereas the motion to strike all references to Feker's former Iranian citizenship is granted.

## IV. CONCLUSION

Defendants have moved to dismiss a number of Plaintiffs' twenty-two causes of action. First, Defendants moved to dismiss Plaintiffs' RICO claims. All Plaintiffs' § 1962(a) claims survive this Rule 12(b)(6) motion except those filed by Plaintiffs Pacific Poly Pro and Energy Engineering & Construction. Their claims are dismissed without prejudice.[25] All Plaintiffs' § 1962(b) claims sur-

---

**25.** The court has exercised its discretion to order that the dismissal of claims be without prejudice

vive this Rule 12(b)(6) motion except the claim filed by Allied Construction & Engineering, Inc. Allied's claim is dismissed without prejudice. However, all Plaintiffs' § 1962(c) and § 1962(d) claims are dismissed without prejudice.

Second, Defendants moved to dismiss Plaintiffs' claims for breach of contract, tortious interference with contractual relations, and for a violation of Title VII. Defendants' motion is denied as to these claims.

Third, Defendants moved to dismiss Plaintiffs' SCUTPA claims. Defendants' motion is denied as to Plaintiffs Sadighi and Miller but granted as to Plaintiffs Riggins and NeSmith.

Fourth, Defendants moved to strike a number of allegations in Plaintiffs' Complaint. This motion is denied except as to the references to Feker's former Iranian citizenship, which is hereby stricken from the Complaint.

Finally, Defendants moved to dismiss Plaintiffs' alter ego allegations. These allegations are sufficient to place Defendants on notice that Plaintiffs' intend to pierce the corporate veil of Feker's numerous companies. Therefore, Defendants' motion is denied.

It is therefore,

**ORDERED,** that Defendants' Motion to Dismiss and to Strike be **GRANTED** in part and **DENIED** in part.

**AND IT IS SO ORDERED.**

## APPENDIX I

Because of the number of Plaintiffs and claims in the RICO cause of action, this appendix is attached as a guide for the parties.

### § 1962(a) RICO Claims

| Plaintiff | Survives 12(b)(6) Motion | Dismissed Without Prejudice |
|---|---|---|
| Sadighi | X | |
| Pacific Poly Pro | | X |
| Energy Engineering | | X |
| Allied Construction | X | |
| Miller | X | |
| Miller Development | X | |
| Riggins | X | |
| NeSmith | X | |

### § 1962(b) RICO Claims

| Plaintiff | Survives 12(b)(6) Motion | Dismissed Without Prejudice |
|---|---|---|
| Sadighi | X | |
| Pacific Poly Pro | X | |
| Energy Engineering | X | |
| Allied Construction | | X |
| Miller | X | |
| Miller Development | X | |
| Riggins | X | |
| NeSmith | X | |

in order to provide Plaintiffs an opportunity to replead. *See Carter v. Norfolk Community Hosp. Ass'n, Inc.,* 761 F.2d 970, 974 (4th Cir.1985).

### § 1962(c) RICO Claims

| Plaintiff | Survives 12(b)(6) Motion | Dismissed Without Prejudice |
| --- | --- | --- |
| Sadighi | | X |
| Pacific Poly Pro | | X |
| Energy Engineering | | X |
| Allied Construction | | X |
| Miller | | X |
| Miller Development | | X |
| Riggins | | X |
| NeSmith | | X |

### § 1962(d) RICO Claims

| Plaintiff | Survives 12(b)(6) Motion | Dismissed Without Prejudice |
| --- | --- | --- |
| Sadighi | | X |
| Pacific Poly Pro | | X |
| Energy Engineering | | X |
| Allied Construction | | X |
| Miller | | X |
| Miller Development | | X |
| Riggins | | X |
| NeSmith | | X |